HARRY G. JURGENS, Respondent, v. GUY A. THOMPSON, Trustee for the Missouri Pacific Railroad Company, a Corporation, Appellant.—No. 38115.—169 S. W. (2d) 353.

Division Two, January 4, 1943.

Rehearing Denied, March 25, 1943.

*Thos. J. Cole* for appellant.

*Mark D. Eagleton* and *Donald Gunn* for respondent.

916

 W.ESTHUES, C.—Respondent Jurgens instituted this suit against appellant, Missouri Pacific Railroad Company, seeking $10,-000.00 as damages for the death of his wife, alleged to have been caused through the negligence of the railroad company. A trial resulted in a verdict for the defendant. Plaintiff's motion for a new trial was sustained and defendant railroad company appealed.

 The trial court sustained the motion for new trial on the theory that instruction number three, given at defendant's request, was erroneous. Appellant, on this appeal, has devoted the major portion of its brief to the question of whether plaintiff's evidence was sufficient to make a case for a jury. It is earnestly insisted that the deceased and plaintiff were guilty of contributory negligence as a matter of law. Pläintiff's wife met her death on October 8, 1938, at Eureka, Missouri, in a grade crossing collision of a car in which she was a passenger and one of defendant's trains. The car involved was a 1930, Nash coach. Floyd Jackson was in the front seat with William Sicking, the driver of the car, and plaintiff and his wife were occupying the rear seat, plaintiff's wife being seated directly behind the driver. They were on their way from St. Louis to a club house on Big river, south of Eureka, where they were to be joined by other parties for an outing. The main tracks of the defendant railroad and those of the Frisco run parallel east and west through the town of Eureka where they cross Central avenue at grade. Each company maintains three tracks and at this point the Frisco's tracks are south of those of defendant. It was conceded that a watchman had been stationed at the crossing whose duty it was to warn travelers on the highway of the approach of trains by holding up a stop sign. Immediately north of the tracks is a public road running

east and west which also intersects the highway upon which the car in question was traveling. All of the parties in the car knew of the crossing and also of the duties of the watchman, having passed over this crossing many times. The car was being driven south on Central avenue toward the crossing at an estimated· speed of ten to twenty miles per hour. Houses on each corner of the intersection obstruct the view of on-coming trains up to a point about seventy-five or eighty feet from the defendant's tracks, but from that point up to the tracks the view is unobstructed in both directions for more than a mile. The collision occurred on the middle track and the car was struck by a train traveling east. Sicking, the driver, testified that he did not look east or west for trains but looked straight ahead. Note his evidence when asked why he did not look for trains:

"A. Well, I have been there for quite a good many times and I *usually* depend upon the watchman there, as long as there is no watchman there, like everyone else does there, they all—just as long as the watchman ain't there to put up the sign, they just keep on going. It seems like that is the way everyone drives. They depend upon the watchman."

Mr. Jackson, who was in the front seat with Sicking, saw the train. Note his evidence:

"Well, owing to the tremendous smoke coming from the stack, and the dust flying, it was quite evident that something was coming towards us, and being of the nature that I am, probably a little bit more in advance to other people in avoiding accidents, I immediately got out of the car, jumped out of the car, and hollered to the rest of the boys, I think something like 'You better get out,' or 'you better get out of the car.' Anyway, I don't know what I hollered."

·This witness testified that as he jumped from the car he saw the driver reach for the emergency brake; that the car was then forty or fifty· feet from the railroad tracks and traveling about fifteen or twenty miles per hour. The driver and plaintiff also jumped from the car before the crash, but plaintiff's wife did not and died as a result of the accident. Plaintiff testified on this point as follows:

"Well, we started to go down Central avenue, which we had done several times before and of course, we always noticed there was a watchman at the crossing. Of course, I paid no particular attention to that. I was not driving, but as we got close down to the tracks, it seems as though all of a sudden Mr. Jackson says, 'Everybody out' or 'Jump,' or something to that effect and, of course, me sitting in the back seat, I couldn't say whether they were pressing on the brakes or anything else and Mr. Jackson· jumped out and I being there I followed Mr. Jackson. It seems Mr. Sicking and I almost met at the door going out and Mr. Sicking eventually got out ahead of me, I imagine. I think he did, and I was trying to assist Mrs.

Jurgens, when it appeared to me that the train was right up on us and I just jumped aside to avoid getting hit myself.''

Plaintiff also testified that as he was about to jump from the car he saw the watchman raise the stop sign; that at that time the car was about ten feet from the first track. When asked if the car stopped he answered:

''Well, it almost stopped. When I was running alongside of the car, trying to assist Mrs. Jurgens out, I think the car was—was just barely moving. I have been under that impression and still am.''

Appellant introduced evidence of a conversation between plaintiff and Sicking alleged to have occurred at the scene of the collision. A witness testified that she heard Jurgens, plaintiff, say to Sicking, ''Oh, my God, why didn't you turn up the side road like I asked you to, we tried to get you to stop, we tried to get you to stop.'' That Sicking answered, ''Oh, my God, Harry I don't know—I don't know why I didn't do it.'' The case was submitted to the jury on the single charge that the defendant's watchman was guilty of negligence in failing to give timely warning of the approaching train.

█ We are of the opinion that the evidence above set forth was sufficient to sustain a verdict for plaintiff; that it was sufficient for a jury to find that the watchman failed in his duties and that such failure contributed to the collision; also, that plaintiff and the deceased were not guilty of contributory negligence as a matter of law. Granting for the sake of argument that the driver of the car was negligent, his negligence cannot be imputed to plaintiff █ and the deceased. Appellant does not so contend. As to the question of the contributory negligence of plaintiff and deceased it must be remembered that the collision occurred within four or five seconds after the train was discoverable. Three of the occupants jumped from the car, including plaintiff. It is in evidence that the deceased, being in the back seat, could not get out until those in the front seat had left the car. The passengers were charged with only ordinary care and the defendant's evidence disclosed that they attempted to have the driver stop or turn up the road north of the tracks. All of this must have occurred within four or five seconds. It is more than probable, and a jury could have found, that the driver, due to the excitement of the sudden discovery of an on-coming train, became confused and therefore failed to avert the collision.

The defendant introduced evidence that the watchman performed his duty, and if the instruction hereinafter to be considered was not faulty the verdict for the defendant must be sustained. But we must rule against appellant on the first point that no case was made for a jury. The following cases cited by appellant have been examined and we find nothing therein inconsistent with our ruling. In McFadden v. Baldwin, 119 S. W. (2d) (Mo. App.) 36, l. c. 42, the court, dealing with the law of Kansas, held a guest guilty of

contributory negligence, but as will be seen from the opinion the guest did nothing to warn the driver of the approaching danger. That case is quite different from the state of facts we have in the present case. In the following cases the plaintiff was the driver of the vehicle and of course a different rule applies: Wren v. Chicago, B. & Q. R. Co., 44 S. W. (2d) (Mo. App.), 241; Schaub v. Kansas City Southern R. Co., 133 Mo. App. 444, 113 S. W. 1163; Burge v. Wabash R. Co., 244 Mo. 76, 148 S. W. 925; Nichols v. Chicago & A. R. Co., 250 S. W. (Mo. App.) 627; Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 362, 30 S. W. 339. In Newton v. Wabash R. Co., 152 Mo. App. 167, 132 S. W. 1195, the deceased stepped in front of a moving engine. In the case of Leapard v. Kansas City Rys. Co., 214 S. W. (Mo. App.) 268, the plaintiff was a passenger, but did not warn the driver, and admitted that she took no precaution herself but relied entirely upon the driver. We do not believe that any of these cases control the present situation.

Instruction number three, which the trial court considered erroneous, reads as follows:

"The Court instructs the jury that if you believe and find from the evidence that the sole cause of the collision and the death of plaintiff's wife was the negligence, if any, of the driver of the automobile in failing to look or listen for the approach of a train, if he did so fail, or in failing to stop said automobile before collision with the train, if he could have done so by exercising the highest degree of care in operating his automobile, and that negligence of the defendant, if any, neither caused nor contributed to cause the death of plaintiff's wife, then plaintiff cannot recover and your verdict should be for the defendant."

The trial court in a memorandum opinion held the instruction bad because in the forepart of the instruction it was assumed that the driver of the car was negligent, also because the portion of the instruction dealing with the question of the driver failing to stop the car before the collision was incomplete in that it failed to specify as to when and where the duty to stop arose. The trial court cited the cases of Stanich v. Western Union Tel. Co., 348 Mo. 188, 153 S. W. (2d) 54 and Shields v. Keller, 348 Mo. 326, 153 S. W. (2d) 60, as authority for its ruling. Respondent in support of the ruling of the trial court holding the instruction erroneous cited the following cases: Fassi v. Schuler, 349 Mo. 160, 159 S. W. (2d) 774; Stanich v. Western Union Tel. Co. and Shields v. Keller, supra; Wilson v. Terminal R. Ass'n. of St. Louis, 121 S. W. (2d) 232. The first question is, was the instruction erroneous even if it assumed that the driver of the car was negligent? We think not, for the reason that the driver was negligent as a matter of law. He testified that he was well acquainted with the crossing and knew he was approaching the main lines of the Missouri Pacific and the Frisco. It was con-

ceded that for a distance of seventy-five feet north of the tracks the view was unobstructed and on-coming trains could be seen for more than a mile. Sicking further testified that he looked neither to his right or left for trains but depended wholly upon the watchman; that he therefore looked straight ahead and seeing no watchman drove on. The driver was in duty bound to exercise the highest degree of care. He did not do this for he depended entirely upon the watchman when merely to have looked would have disclosed the danger in time to have avoided a collision. ▮▮ Leapard v. Kansas City R. Co., supra; State ex rel. Hines v. Bland, 237 S. W. 1018. In Gorman v. St. Louis Merchants' Bridge Terminal R. Co., 325 Mo. 326, 28 S. W. (2d) 1023, l. c. 1024 (2-4), the gates maintained at the crossing where the collision occurred were open. This court held that the gates being open was some assurance of safety, but in that case the collision occurred on a foggy night and the plaintiff stopped, looked and listened before attempting to drive upon the crossing. This court in the course of its opinion said:

"But appellant insists that plaintiff was not relying on them, or else he would not have stopped and looked and listened, as he said he did, before attempting to cross. On the contrary, a person of prudence and caution would not have relied *solely* upon the performance by the railroad company of the duty it had assumed in the premises; he would have used his own senses, but no doubt would have been less vigilant than if the implied assurance that the crossing could be made in safety had not existed."

This court then quoted with approval the following taken from Yonkers v. Railroad, 182 Mo. App. 558, l. c. 568, 168 S. W. 307, l. c. 309:

" 'The fact that the gates were maintained, and that they were open at this particular time, necessarily constituted an invitation to one to pass upon or over the defendant's tracks. It was essentially an assurance to plaintiff, driving upon the street, that no danger need be feared from an approaching train. While it may be true that she was not so far relieved of the duty to look and listen that she could go blindly and heedlessly upon the tracks, relying wholly upon the fact that the gates were not closed, nevertheless her duty to look and listen is to be regarded as modified, to a great extent at least, by the fact that the open gates constituted an invitation to go upon the tracks and an assurance of safety in so doing.' "

In the case before us the driver admitted he did not stop, look or listen but blindly and heedlessly drove toward the tracks relying wholly upon the watchman to perform his duty. In the circumstances he was beyond doubt guilty of negligence as a matter of law.

Neither do we think that the instruction was bad or incomplete with reference to the driver's failure to stop before colliding with the train. That clause of the instruction, under the circumstances, could

only refer to a stop made by the driver within the seventy-five feet between the building, where the train could have been seen, and the railroad tracks. Obviously it could not be interpreted any other way. If this instruction had applied to the engineer of the train a different situation would have been presented because the engineer would not have been in duty bound to stop or slacken his speed until the danger became apparent. That of course is not in this case. Let us suppose then that the jury understood the instruction to mean that if the sole cause of the collision and death of plaintiff's wife was the negligence of the driver in failing to look or listen for the approach of a train, or failure to stop the car before colliding with the train, if he could have done so by exercising the highest degree of care, and that negligence of the defendant, if any, neither caused or contributed to cause the death of plaintiff's wife, then a verdict for the defendant should be returned. It is apparent that if the jury so found, then under the law a verdict for the defendant was authorized. The jury evidently found that the watchman was at his post performing his duty. That was the sole issue of negligence submitted by plaintiff's instructions. Plaintiff's instructions authorized a verdict for plaintiff if the jury found defendant was negligent in that the watchman failed in his duty; that such negligence contributed to cause or caused the death of plaintiff's wife and that plaintiff and his wife were free from negligence. As we stated above the evidence was sufficient to sustain a verdict for plaintiff. Defendant's instructions required the jury to find that the railroad was free from negligence before a verdict for it was justified. The evidence introduced by the defendant was ample for the jury to find that the watchman performed his duty. The watchman testified he saw the car when approximately three hundred feet away; that he held up the stop sign and blew a whistle; that he thought the car was going to stop because it approached the crossing at a moderate rate of speed. Instructions must be considered in the light of facts supported by evidence. We do not find wherein our ruling conflicts with any of the cases cited. In the Fassi case, 349 Mo. 160, 159 S. W. (2d) 774, l. c. 777 (7) (8), this court said:

" 'Before a defendant can be entitled to a sole cause instruction, he must have evidence which tends to prove facts that will sustain it. Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54.'

"In other words, sole cause means the act or negligence of the plaintiff or a third party directly causing the injury without any concurring or contributory negligence of the defendant."

As we said above, in this case the defendant introduced evidence from which a jury could find that the negligence of a third person was the sole cause of the death of plaintiff's wife and that the defendant was not negligent. In the Stanich case the court condemned

an instruction because no facts were hypothesized and the instruction consisted merely of abstract propositions of law. It is urged that in the instruction under consideration the clause with reference to the defendant's negligence was bad because it merely stated an abstract proposition of law. Plaintiff, however, had hypothesized the facts, which, if found to be true by the jury, constituted negligence on part of the defendant. The defendant need not negative all those facts in its instruction. A finding for the defendant under the questioned instruction would mean that the jury believed the defendant's witnesses and not plaintiff's on the question of fact of whether the watchman performed his duty. In the Shields case the court held that there was no evidence upon which to base the defendant's instruction and therefore it was erroneous. In the Wilson case the facts and circumstances were entirely different from those in the present case and therefore the ruling there is not applicable. In reviewing instructions approved or disapproved in various cases it is always important to consider the facts upon which the instructions were based. We have reached the conclusion that instruction number three, while not a model, was not erroneous under the evidence adduced. It follows that the order of the trial court granting plaintiff a new trial was error. The cause is therefore remanded with directions to the trial court to set aside its order granting plaintiff a new trial, to reinstate the verdict of the jury and enter judgmen thereon. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—Respondent in his motion for rehearing insists that we were in error in holding the trial court was not justified in granting a new trial because of instruction number three given on behalf of the defendant. On the motion for rehearing respondent has the following to say:

"The Court erred in holding that defendant's instruction No. 3 was proper, when it did not hypothesize any facts for the jury to find before permitting the jury to say that the driver of the automobile was guilty of negligence, either in failing to listen, failing to look or in failing to stop, when said instruction should have required the jury to find: (1) that a bell or signal was sounded so that the driver of the automobile could have heard it had he listened; (2) that by looking the driver could have seen the on-coming train in time to avoid a collision therewith; and (3) that the driver of the automobile was not required to stop, when approaching said crossing, unless he saw or heard, or in the exercise of the highest degree of care on his part could have seen or heard, the on-coming train in such close

and dangerous proximity to said crossing, in time, thereafter, in the exercise of the highest degree of care on the part of the driver of the automobile, to have avoided said collision by stopping his said automobile, and that the driver did fail so to do, and that in thus failing he was then and there guilty of negligence, and that said negligence was the sole cause of the collision.''

The opinion probably should have been more specific and clear on the point that plaintiff relied entirely upon the alleged negligence of the watchman for a recovery. That was the only charge submitted by plaintiff's instruction. Not only that, but plaintiff in his testimony absolved the train crew from negligence. Note plaintiff's evidence on this point:

''Q. Did you tell Mr. Greenstreet, the fireman, that you did not blame any of the trainmen in any way for this accident? A. No.

''Q. That it was not their fault? A. No.

''Q. Whose fault do you consider it was? A. The watchman.

''Q. Only the watchman? A. Yes.

''Q. Is that right? A. Yes, sir.

''Q. You did not blame the engineer? A. No.

''Q. You did not blame the fireman? A. No.

''Q. You blame no one but the watchman? A. The watchman.

''Q. You know, don't you, it is the engineer's duty to blow the whistle for the crossing? A. Oh, yes.

''Q. And ring the bell? A. Yes.

''Q. And that he has charge of those devices on the engine? A. Yes.

''Q. And you did not hear either the whistle or bell? A. I heard it when Mr. Jackson got out, then I heard the whistle, and I think I heard the bell also at that time.

''Q. But would you say that this engine and bell did not ring half mile away—the whistle did not blow from a half mile clear to the crossing? A. I did not hear it.''

Note that plaintiff heard the whistle and bell of the train as Mr. Jackson left the car. Mr. Jackson's testimony as to where he got out of the car was as follows:

''Q. Now, there is a road—I think there is no dispute about this— there is a road that runs to the right between the building that you have described and the tracks? A. Yes, sir.

''Q. Will you state, if you can, where it was with reference to that road, that you left the automobile? A. Well, I landed on the road, I would say somewheres near the center of the road and south edge of the road.''

''Q. You mean you were forty or fifty— A. I imagine the point I alighted from the machine was between forty to fifty feet from the railroad tracks, sir.

"Q. From the first track? A. Yes, as near as I can remember."

Since plaintiff did not place any blame on the train crew and his evidence absolved them from negligence, he was not entitled to a verdict based upon a theory that the train crew may have been negligent. Instruction number three required the jury to find, before authorizing a verdict for the defendant, that the negligence of the driver of the car was the cause of the collision and that the defendant's negligence, if any, did not contribute thereto. Under the facts of the case the instruction was not erroneous. Respondent overlooks the law that drivers of cars must exercise the highest degree of care when approaching a railroad crossing. That means that the driver must have the car under control so as to be able to stop in case of danger. It is evident that the driver of the car in question was not exercising the highest degree of care, in fact he was negligent as a matter of law. He did not or could not stop even though Mr. Jackson admonished him of the approaching train when the car was over fifty feet from the track upon which the train was traveling.

The motion for rehearing is overruled.